**FILED**

03/22/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0032

DA 21-0032

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2022 MT 57

EGAN SLOUGH COMMUNITY, YES! FOR FLATHEAD
FARMS AND WATER, and AMY WALLER,

      Plaintiffs and Appellants,

    v.

FLATHEAD COUNTY BOARD OF COUNTY COMMISSIONERS,
A Body Politic of Flathead County, FLATHEAD COUNTY
PLANNING AND ZONING DEPARTMENT, and FLATHEAD
CITY-COUNTY HEALTH DEPARTMENT,

      Defendants and Appellees,

    and

MONTANA ARTESIAN WATER COMPANY,

      Defendant, Appellee, and Cross-Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                In and For the County of Flathead, Cause No. DV-15-2018-952
                Honorable Robert B. Allison, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Roger Sullivan (argued), Dustin Leftridge, McGarvey Law, Kalispell,
            Montana

            David K. W. Wilson, Jr. (argued), Morrison, Sherwood, Wilson & Deola,
            Helena, Montana

      For Appellees:

            Alan McCormick (argued), Garlington, Lohn & Robinson, PLLP, Missoula,
            Montana

Tara R. Fugina, Deputy Flathead County Attorney, Kalispell, Montana

For Appellee/Cross-Appellant Montana Artesian Water Company:

Victoria A. Marquis (argued), Shane P. Coleman, Holland & Hart LLP, Billings, Montana

Argued and Submitted: January 19, 2022

Decided: March 22, 2022

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 This case arises from litigation related to the expansion of an agricultural zoning district through citizen initiative to include the area where Montana Artesian Water Company (Montana Artesian) has been developing a large-scale water bottling plant. Egan Slough Community, Yes! For Flathead Farms and Water, and Amy Waller (collectively, Egan Slough Community) appeal from the Order Re Summary Judgment II, issued by the Eleventh Judicial District Court, Flathead County, on November 25, 2019. Montana Artesian cross-appeals from the Order Re Summary Judgment issued June 6, 2019; the Order Re Protective Orders and Motion to Compel issued August 26, 2019; the Order Re Summary Judgment III issued December 15, 2020; and the Order Denying Attorney Fees and Costs issued May 25, 2021.

¶2 We restate the issue on appeal:

> *1. Whether Montana Artesian's water bottling facility is a valid nonconforming use under the Egan Slough Zoning District Regulations.*

Montana Artesian raises numerous issues on cross-appeal.[1] We renumber and restate the issues raised on cross-appeal:

> *2. Whether the initiative was illegal because it impacted less than the entire county under this Court's holding in* City of Shelby v. Sandholm*;*
>
> *3. Whether the initiative violated § 7-5-132(1), MCA, by both enacting a resolution and repealing a different resolution;*
>
> *4. Whether the initiative violated § 7-5-132(4)(b), MCA, by failing to set out fully the resolution to be repealed;*

---

[1] We encourage parties to limit the number of issues to four or fewer. *See* M. R. App. P. 12(1)(b).

3

*5. Whether the initiative violated § 7-5-132(4)(a), MCA, by legislating on multiple subjects;*

*6. Whether the initiative violated § 7-5-131(1), MCA, by legislating on subjects beyond the authority of the Flathead County Board of County Commissioners;*

*7. Whether the initiative creates illegal reverse spot zoning;*

*8. Whether the District Court abused its discretion in declining to compel discovery;*

*9. Whether the initiative violated procedural due process;*

*10. Whether the initiative violated the right to equal protection;*

*11. Whether the initiative constitutes a taking of Montana Artesian's water right and other business property; and*

*12. Whether the District Court abused its discretion in denying Montana Artesian attorney fees and costs related to defending Egan Slough Community's petition for writ of mandate.*

¶3      We affirm the District Court on all issues raised.

## PROCEDURAL AND FACTUAL BACKGROUND

¶4      The Flathead County Board of County Commissioners (Board) created the Egan Slough Zoning District (ESZD) in the Creston area in December 2002, with the adoption of Flathead County Resolutions 1594 and 1594A.  The original ESZD was a citizen-initiated zoning district created pursuant to Title 76, chapter 2, part 1, MCA, often referred to as Part 1 zoning.  Section 5 of the ESZD regulations states the purpose of the ESZD "is to protect and preserve agricultural land in the Egan Slough area for the performance of a wide range of agricultural functions.  It is intended to control the scattered intrusion of uses not compatible with an agricultural environment, including, but not limited to, residential development."  Permitted uses are limited to agricultural,

4

horticultural, and silvicultural uses, residential dwellings, and ancillary activities. The ESZD regulations provide for 80-acre minimum lot sizes, limitations on subdivision of land, and performance standards for permitted uses. Some conditional uses are possible with a conditional use permit, but none of the allowed conditional uses involve industrial activities such as a water bottling plant. The ESZD regulations also include provisions for nonconforming uses, which pertain to uses and structures that existed prior to the adoption of the regulations or, in this case, prior to the expansion of the ESZD to include the additional property.

¶5    Lew and Larel Weaver (Weavers) are property owners in the Creston area. Part of their property was included in the original boundaries of the ESZD. The Weavers formed Montana Artesian as a Montana for-profit corporation in 2014 to develop a water bottling plant on land owned by their company Weaver Entities, Inc., outside the original boundaries of the ESZD. Since 2014, Weaver Entities, the Weavers, and Montana Artesian have acquired numerous permits and constructed a building and commercial water well toward the goal of operating a water bottling plant. Montana Artesian acquired a permit from the Department of Natural Resources and Conservation (DNRC) to appropriate 710.53 acre feet of water annually with a priority date of June 24, 2015.[2]  The existing

[2] Montana Artesian's water permit from DNRC and wastewater discharge permit from the Department of Environmental Quality (DEQ) are being challenged in separate litigation. *See Water for Flathead's Future, Inc., et al. v. Mont. Dep't of Envtl. Quality, et al.*, No. DV-15-2017-1109(A) (Mont. Eleventh Judicial Dist.); *Flathead Lakers Inc., et al. v. Mont. Dep't of Nat. Res. and Conservation, et al.*, No. CDV-2018-135 (Mont. First Judicial Dist.). For purposes of this Opinion, we assume Montana Artesian's permits from DEQ and DNRC are valid, without expressing any opinion on the issues raised in those cases.

facility in its present configuration and with its present equipment is not designed to utilize the entire water right. For example, the current septic system is designed to accommodate only one-quarter of the anticipated wastewater at full build-out. Montana Artesian's plan from the start was to gradually expand operations over the course of twenty years. Expanding its current operation would require Montana Artesian to expand the size of its building and obtain a new wastewater discharge permit, as well as other new or revised permits. Based on the business plan submitted with Montana Artesian's application for a water permit, DNRC gave Montana Artesian until 2039 to file its notice of project completion to perfect its water right.

¶6  In June 2016, the Board received a citizen-initiated zoning petition through Part 1 zoning to expand the original 1,150-acre ESZD to include approximately 530 acres of adjoining property. The proposed expansion included the land on which Montana Artesian was developing its water bottling facility. The Board denied the petition in November 2016 with the adoption of Resolution 1594B.[3]

¶7  After the Board denied the petition to expand the ESZD, Egan Slough Community sought to expand the ESZD through citizen initiative. Egan Slough Community and other proponents gathered signatures to put Initiative 17-01 on the ballot and place the issue of

---

[3] Egan Slough Community challenged the denial in a separate lawsuit before the Eleventh Judicial District Court, Flathead County. The district court granted summary judgment against the Board, determining the Board abused its discretion in denying the petition and the decision was unlawful because the Board failed to address the issues raised in the record and failed to articulate a rational basis for denying the petition. Enforcement of the judgment and further proceedings in the case have been stayed. *See Egan Slough Cmty., et al. v. Flathead Cty. Bd. of Cty. Comm'rs, et al.*, No. DV-15-2016-1059-RP (Mont. Eleventh Judicial Dist.)

expanding the ESZD directly before the voters of Flathead County. On June 5, 2018, the voters of Flathead County passed Initiative 17-01, with 70 percent of the electors voting in favor of expanding the ESZD. The results of the election were certified on June 21, 2018. The initiative enacted Resolution 1594C, which added approximately 530 acres of adjoining land to the ESZD and subjected the additional land to the ESZD regulations, including the land on which Montana Artesian was developing its commercial water bottling plant.

¶8 The expanded ESZD went into effect on June 21, 2018. At this time, Montana Artesian was ready for operation but for one final permit needed to sell bottled water or distribute it to the public. Prior to June 21, 2018, Montana Artesian had not sold or shipped commercial quantities of bottled water. It acquired its final permit, the Wholesale Food Manufacturing License on July 3, 2018, and began bottling, selling, and distributing bottled water at that time.

¶9 On June 29, 2018, counsel for Egan Slough Community wrote to the Flathead County Attorney, requesting the County enforce the ESZD regulations against Montana Artesian. The County Attorney passed the letter to the Flathead County Planning and Zoning Department ("FCPZ Department"), which treated the letter as a zoning violation complaint and initiated an investigation. The FCPZ Department conducted a site visit on July 12, 2018. Montana Artesian was bottling water to fulfill existing contracts during the site visit. Counsel for Egan Slough Community wrote to the County again on August 8, 2018, arguing the County needed to enforce the ESZD regulations against Montana Artesian to shut down its operations.

¶10    After receiving no response, Egan Slough Community filed this lawsuit on September 7, 2018, against the Flathead County defendants and Montana Artesian. Egan Slough Community sought mandamus relief from the court, arguing the County had a clear legal duty to enforce the ESZD regulations against Montana Artesian. Egan Slough Community also sought declaratory judgment concluding Montana Artesian's operations were not permitted under the ESZD regulations. Montana Artesian filed counterclaims, alleging the initiative was unconstitutional, illegal, and could not be enforced. The County opposed both Egan Slough Community's contentions Montana Artesian was not a legal nonconforming use and Montana Artesian's contentions the ESZD regulations amounted to a taking without just compensation. The County deferred to the District Court on the remaining issues Montana Artesian raised.

¶11    Before the court ruled on Egan Slough Community's petition for writ of mandate, the FCPZ Department issued its Enforcement Decision on January 4, 2019, concluding Montana Artesian's facility was a legal nonconforming use as the building was built and capable of producing commercial quantities of bottled water before June 21, 2018, and allowing Montana Artesian to "conduct operations in the manner described in its various permits" and in accordance with Section 14 of the ESZD regulations.[4] The Enforcement Decision notes "[c]hanges to Montana Artesian's water bottling facility are permitted only in accordance with Section 14.4" and "[a]ny changes to the water bottling facility which

---

[4] After the County issued its Enforcement Decision, Egan Slough Community amended its complaint to add a challenge to the Enforcement Decision.

requires [sic] a material amendment to the permits set forth above may result in a reevaluation of Montana Artesian's nonconforming status." Section 14.4 permits various changes to current use, including expansion of its existing building by up to 50 percent.

¶12 The parties submitted the case to the District Court through several motions for summary judgment. The District Court entered three orders on summary judgment over the course of the litigation. On June 6, 2019, the District Court denied Montana Artesian's motion for summary judgment and upheld the validity of the ballot initiative process. On November 25, 2019, the District Court denied Egan Slough Community's motion for summary judgment and upheld the Enforcement Decision conclusion Montana Artesian's facility is a legal nonconforming use under the ESZD regulations. On December 15, 2020, the District Court granted summary judgment to Egan Slough Community and held Initiative 17-01 and the ESZD regulations were not unconstitutional and Initiative 17-01 did not constitute illegal reverse spot zoning. All three orders are challenged on appeal. Montana Artesian also challenges the District Court's denial of its motion to compel discovery and denial of its motion for attorney fees. Additional facts will be discussed below as necessary.

**STANDARD OF REVIEW**

¶13 Courts review a zoning authority's decision to enact or amend a zoning designation for an abuse of discretion under the applicable planning and zoning statutes. *Botz v. Bridger Canyon Planning & Zoning Comm'n*, 2012 MT 262, ¶ 17, 367 Mont. 47, 289 P.3d 180. "An abuse of discretion occurs when the information upon which the [county] entity based its decision is so lacking in fact and foundation that it is clearly unreasonable." *Botz*,

¶ 17.   The interpretation and application of an ordinance are questions of law this Court reviews for correctness.  *Botz*, ¶ 18.

¶14    This court reviews a district court's decision to grant summary judgment de novo, applying the criteria of M. R. Civ. P. 56(c).  *Farmers Union Mut. Ins. Co. v. Staples*, 2004 MT 108, ¶ 18, 321 Mont. 99, 90 P.3d 381.  We review the district court's conclusions of law for correctness.  *Farmers Union Mut. Ins. Co.*, ¶ 18.

¶15    We review a district court's order denying a motion to compel discovery for an abuse of discretion.  *Lynes v. Helm*, 2007 MT 226, ¶ 17, 339 Mont. 120, 168 P.3d 651.

¶16    "This Court exercises plenary review of constitutional issues and a district court's decisions on constitutional issues are reviewed for correctness."  *Botz*, ¶ 19.

¶17    A district court's decision to award or deny attorney fees and costs under the equitable exception first announced in *Foy v. Anderson*, 176 Mont. 507, 511-12, 580 P.2d 114, 116-17 (1978), "is within [its] discretion and will not be overturned absent a showing of abuse of discretion."  *Rafes v. McMillan*, 2022 MT 13, ¶ 16, 407 Mont. 254, ___ P.3d ___ (quoting *State ex rel. Wilson v. Dep't of Nat. Res. & Conservation*, 199 Mont. 189, 196, 648 P.2d 766, 769 (1982)).

**DISCUSSION**

¶18    *1. Whether Montana Artesian's water bottling facility is a valid nonconforming use under the Egan Slough Zoning District Regulations.*

¶19    The parties agree Montana Artesian's water bottling operation is not a permitted, accessory, or conditional use allowed under the ESZD regulations.  Egan Slough Community contends Montana Artesian's plastic water bottling operation is also not a legal

10

nonconforming use under the regulations. Egan Slough Community maintains § 14.1 governs whether the water bottling plant is a legal nonconforming use that may continue and that section allows nonconforming uses to continue only to the same manner and the same extent as before the expansion of the ESZD on June 21, 2018. Egan Slough Community maintains the "manner and extent" of the use did not include an operating and producing water bottling plant on June 21, 2018. Egan Slough Community argues the seminal case on nonconforming uses, *Russell v. Flathead County*, 2003 MT 8, 314 Mont. 26, 67 P.3d 182, governs this case. Egan Slough Community asserts the Court in *Russell* employed a "before and after zoning" comparison when interpreting the same regulatory language that appears in § 14.1 of the ESZD regulations at issue here.

¶20 The County maintains the ESZD regulations separate nonconforming uses into two categories: (1) those that existed and were fully operational at the time the regulations took effect; and (2) those for which a building permit had been issued but were not fully operational at the time the regulations took effect. The County argues § 14.3 provides a safe harbor provision to protect landowners and permit holders by providing vested rights to carry out construction and associated operations. The County contends Montana Artesian's facility is a legal nonconforming use under § 14.3 of the regulations and may operate consistent with the permits it has received. Montana Artesian adopts the County's arguments.

¶21 The District Court affirmed the Enforcement Decision of the County under § 14.1. The District Court explained the use of the property leading up to June 21, 2018, included over three years of steady preparation to establish a water bottling business, which included

11

applications for a water right, many permits, and inspections. This preparation established the manner and extent of the nonconforming use. The District Court explained the manner was limited to use as a water bottling facility and the extent of that use was limited by the various permits. The District Court confirmed this reading of § 14.1 by considering it in the context of § 14.2 and § 14.3, both of which the court concluded confirm the word "continue" implies movement into the future.

¶22 In interpreting zoning ordinances, courts apply the basic rules of statutory construction. *Schanz v. City of Billings*, 182 Mont. 328, 332, 597 P.2d 67, 69 (1979); *see also Flathead Citizens for Quality Growth, Inc. v. Flathead Cty. Bd. of Adjustment*, 2008 MT 1, ¶ 37, 341 Mont. 1, 175 P.3d 282. "If the language of an ordinance is plain and unambiguous, it is not subject to interpretation or open to construction but must be accepted and enforced as written." *Schanz*, 182 Mont. at 332, 597 P.2d at 69. We will not "insert what has been omitted" or "omit what has been inserted." Section 1-2-101, MCA. We interpret a zoning regulation to give effect to all its provisions. Section 1-2-101, MCA; *Flathead Citizens for Quality Growth, Inc.*, ¶ 37.

¶23 Section 76-2-105, MCA, provides "[e]xisting nonconforming uses may be continued although not in conformity with such zoning regulations" in zoning districts created under Part 1 zoning.[5] The ESZD regulations define a "nonconforming use" as "[a]ny building or land lawfully occupied by a use at the time of passage of this resolution or amendment thereto, which does not conform after the passage of this resolution or

[5] The Board created the ESZD in 2002 through the Part 1 zoning process.

12

amendments thereto with the use or dimensional regulations of the district in which it is situated." Section 14 of the ESZD regulations, which governs nonconformities, provides in pertinent part:

1. If, at the adopting of these regulations or of any amendments thereto, or at the time a zoning district to which these regulations are applied is created, any lot, structure, or building being used in an otherwise lawful manner that does not conform to the use provisions of these regulations, or if any structure or building was located or erected in an otherwise lawful manner that does not conform to the lot coverage or height limit of these regulations, such use of such location or erection shall be deemed to be a nonconforming use and may continue in the manner and to the extent that it existed or was being used at the time of adoption of these regulations. Such nonconforming status will run with the lot, building, structure, or use and shall not be affected by changes in ownership.

2. Any nonconforming use may be continued except if any such nonconforming use is abandoned or deserted, or voluntarily or by legal action caused to be discontinued for a period of 180 days, then any subsequent use of the lot, building, structure, or use of the land shall be required to be in conformity with the provisions of these regulations.

3. Any building for which a building permit has been issued or, if a building permit is not required, on-site construction has begun prior to the adoption or amendment of these regulations, or creation of a zoning district to which these regulations apply, and the erection of which is in conformity with the plans submitted and approved for such permit, but does not conform to the provisions of these regulations, is a nonconforming use.

¶24 We first look to the language of § 14.1 and the question of how to define what the lawful use of the property was on June 21, 2018, when the ESZD regulations went into effect. Egan Slough Community argues on June 21, 2018, Montana Artesian was not producing, selling, or distributing bottled water. Egan Slough Community maintains the steady preparation to do so is an irrelevant consideration. Under this reading, Montana Artesian may produce no more bottled water after June 21, 2018, than it did before June 21, 2018. The District Court and the FCPZ Department, on the other hand, both considered

13

the steady preparation over three years to operate a water bottling business. Both concluded Montana Artesian may continue operating its business after June 21, 2018, as limited by the permits it has already obtained.

¶25 Under § 14.1 a nonconforming use of a lot or building may continue within the ESZD if the use of the lot or building was done "in an otherwise lawful manner" before the regulations went into effect. Section 14.1 then limits the continued nonconforming use to "the manner and to the extent that it existed or was being used at the time of adoption of these regulations." In its Enforcement Decision, the FCPZ Department noted the only necessary permit outstanding on June 21, 2018 was a Wholesale Food Manufacturing license, which can only be issued once the facility is completed and labeling approval has been received from the State of Montana. Montana Artesian applied for this license before June 21, 2018, and it was issued on July 3, 2018. Although unable to sell and distribute bottled water without that license, the FCPZ Department found "the facility was completed and capable of producing commercial levels of water bottling prior to the expansion of the Egan Slough Zoning District." At the time the ESZD regulations went into effect, Montana Artesian was operating its water bottling facility "in an otherwise lawful manner" and had been working toward commercial production and distribution for years. After June 21, 2018, this use did "not conform to the use provisions" of the ESZD regulations. Thus, under the plain language of § 14.1 the water bottling business became a nonconforming use when the regulations went into effect.

¶26 The regulations allow this nonconforming use to "continue in the manner and to the extent that it existed or was being used at the time of adoption of" the ESZD regulations.

14

Under the regulations, consideration of manner and extent includes how "it existed *or* was being used" at the time the regulations went into effect. (Emphasis added.) Egan Slough Community focuses on how the facility was being used on June 21, 2018—Montana Artesian had yet to produce, sell, or distribute bottled water on that date. But at the time the regulations went into effect the water bottling facility "existed" as a facility capable of producing commercial levels of bottled water as limited by the permits required for it to operate. The FCPZ Department and the District Court correctly considered Montana Artesian's development of the project and acquisition of and applications for permits over three years when considering what nonconforming use existed at the time the regulations went into effect. Montana Artesian had been steadily working to develop an operating commercial water bottling facility, had constructed a building and water well, had acquired water bottling equipment, and had acquired all necessary permits save the Wholesale Food Manufacturing License, for which it had already applied. The manner of Montana Artesian's nonconforming use is limited to operating a water bottling facility. The extent of Montana Artesian's use is limited by its permits already acquired or applied for when the regulations went into effect. The FCPZ Department correctly concluded under the ESZD regulations, Montana Artesian could continue to "operate the water bottling facility to an extent consistent with" its permits as a legal nonconforming use. In addition, the County specifically found expansion of the operations beyond its current permits or building size would be subject to § 14.4 of ESZD regulations governing changes to nonconforming uses.

15

¶27    Section 14.3 further bolsters this conclusion.  The language of § 14.3 deems any building that "does not conform to the provisions of these regulations" but was permitted before the effective date to be a nonconforming use.  This language is broad and not limited to regulations about lot coverage and height limits as urged by Egan Slough Community.  Section 14.3 specifically authorizes prospective land uses to be completed and carried out after the effective date of new zoning regulations when the building has been permitted or construction begun.  This provision protects landowners who had begun the process of establishing a use before the effective date of the regulations.  Among the many permits related to the development of Montana Artesian's water bottling facility, Weaver Entities acquired a building permit to build the facility to house the water bottling operation.  There is no contention it was not built in conformity with the plans submitted and approved.  Before the regulations went into effect, Montana Artesian had constructed the facility, acquired multiple required permits, and begun test bottling runs.  Montana Artesian may continue to use the facility in conformance with the permits it had acquired or applied for before the regulations went into effect under § 14.3.

¶28    Our prior holding in *Russell* does not change this analysis.  In *Russell*, the Court examined whether a landowner who purchased property with a nonconforming use designation impermissibly expanded the scope of the nonconforming use beyond the previous owner's use.  *Russell*, ¶ 41.  In *Russell*, the previous landowner operated a dairy farm and had a shop building the landowner used to repair farm equipment and build trailers and hitches.  This use of the building began prior to the adoption of agricultural zoning regulations.  *Russell*, ¶ 39.  Six years later, a new landowner ceased all agricultural

16

use and began using the property for an equipment repair business for heavy equipment. *Russell*, ¶ 40. The Court in *Russell* compared the previous owner's use of the property to the use by the new landowner to determine if the scope of a valid nonconforming use had expanded. The Court concluded the heavy equipment repair operations were substantially different than the previous landowner's repair of farm equipment. *Russell*, ¶ 41. The shift from primarily agricultural to primarily commercial many years later was an impermissible expansion of the nonconforming use. *Russell*, ¶¶ 41, 46. The question in *Russell* was whether a legal, nonconforming use was impermissibly expanded years after zoning regulations were enacted when the use of the property had substantially changed. Montana Artesian's use of the property as a water bottling facility remained the same before and after the effective date of the regulations. The District Court did not err in affirming the Enforcement Decision of the FCPZ Department.

¶29 *2. Whether the initiative was illegal because it impacted less than the entire county under this Court's holding in* City of Shelby v. Sandholm.

¶30 Montana Artesian argues the initiative was illegal because under this Court's holding in *City of Shelby v. Sandholm*, 208 Mont. 77, 79, 676 P.2d 178, 179 (1984), initiative "is not a permissible procedure" to expand a zoning district "where the district encompasses less than the entire area" of the county. Montana Artesian asserts the principle announced in *Sandholm*, that "the property owners who will be benefited by the improvement, as well as assessed for the costs of the project, should control whether the project succeeds or fails," governs this case. *Sandholm*, 208 Mont. at 80, 676 P.2d at 179.

17

¶31 *Sandholm* involved the attempt to repeal the creation of a special improvement district (SID) by citizen initiative. In *Sandholm*, the city of Shelby passed a resolution creating a SID to construct, install, and fund a storm sewer system encompassing about two-thirds of the real property within the city. *Sandholm*, 208 Mont. at 79, 676 P.2d at 179. Residents protesting the SID sought a referendum on the creation of the SID, which the election administrator rejected. The city filed a petition for declaratory judgment to determine the validity of the protesters' petition for referendum. The District Court held the city's action in creating the SID was not a legislative act subject to repeal by referendum. *Sandholm*, 208 Mont. at 79, 676 P.2d at 179. This Court agreed the city's action creating the SID was not a legislative act subject to referendum but reasoned further "referendum is not a permissible procedure to challenge the creation of a special improvement district where the district encompasses less than the entire area within the city limits" as "the property owners who will be benefited by the improvement, as well as assessed for the costs of the project, should control whether the project succeeds or fails." *Sandholm*, 208 Mont. at 79-80, 676 P.2d at 179. This is especially true as it is the property within the SID which will be assessed for the costs of the improvement. *See* § 7-12-4162, MCA.

¶32 *Sandholm* is inapposite to the case at hand. Unlike the creation of a SID, zoning is a legislative act that is subject to initiative and referendum. *See Greens at Fort Missoula, LLC v. City of Missoula*, 271 Mont. 398, 403, 897 P.2d 1078, 1080-81 (1995). What's more, the creation of a SID serves a vastly different purpose than the creation of a zoning district. A SID may be created by a city or town pursuant to Title 7, chapter 12, part 41,

18

MCA, to fund and construct various types of infrastructure improvements within the city or town. In *Greens at Fort Missoula, LLC*, this Court recognized SIDs are "improvements that will be of special benefit to the property within the boundaries of any district." *Greens at Fort Missoula, LLC*, 271 Mont. at 404, 897 P.2d at 1081 (quotations and emphasis omitted). Zoning, on the other hand, is a form of regulation that promotes the general public health, safety, and welfare of the whole community by, among other things, separating incompatible land uses and regulating growth and development. *See Williams v. Bd. of Cty. Comm'rs of Missoula Cty.*, 2013 MT 243, ¶ 42, 371 Mont. 356, 308 P.3d 88; *see also Greens at Fort Missoula, LLC*, 271 Mont. at 404, 897 P.2d at 1081 ("[T]he entire community could be affected by the added pressures—financial, social, and environmental."). As the District Court reasoned, county zoning—even Part 1 zoning, which creates zoning districts encompassing less than the whole county—implicates county-wide interests of public health, safety, and welfare. The District Court did not err in determining this Court's holding in *Sandholm* does not govern this case.

¶33    *3. Whether the initiative violated § 7-5-132(1), MCA, by both enacting a resolution and repealing a different resolution.*

¶34    Montana Artesian contends Initiative 17-01 violates § 7-5-132(1), MCA, because it both repealed Resolution 1594B and enacted Resolution 1594C. Montana Artesian argues the use of the word "or" in § 7-5-132(1), MCA, prohibits an initiative from both repealing an ordinance and enacting a new ordinance.

¶35    Section 7-5-132(1), MCA, provides, "The electors of a local government may, by petition, request an election on whether to enact, repeal, or amend an ordinance." In

19

addition, § 7-5-131(1), MCA, provides, with limited exception not at issue here, "the powers of initiative and referendum are reserved to the electors of each local government. Resolutions and ordinances within the legislative jurisdiction and power of the governing body of the local government may be proposed or amended and prior resolutions and ordinances may be repealed in the manner provided" by statute. This Court has long been guided by "the principle that initiative and referendum provisions of the Constitution should be broadly construed to maintain the maximum power in the people, and that statutes in aid of these reserved powers should be liberally construed." *Chouteau County v. Grossman*, 172 Mont. 373, 378, 563 P.2d 1125, 1128 (1977) (internal quotations omitted), *overruled on other grounds by Town of Whitehall v. Preece*, 1998 MT 53, ¶ 27, 288 Mont. 55, 956 P.2d 743; *see also Nicholson v. Cooney*, 265 Mont. 406, 411, 877 P.2d 486, 488 (1994).

¶36 Montana Artesian's reading of § 7-5-132(1), MCA, would greatly limit the power of initiative over local government issues. Reading §§ 7-5-131(1) and 7-5-132(1), MCA, together, it is clear a citizen initiative may both repeal an ordinance and enact a new ordinance in the same initiative. The District Court correctly determined Initiative 17-01 did not violate § 7-5-131(1), MCA. A different interpretation could lead to absurd results.

¶37 *4. Whether the initiative violated § 7-5-132(4)(b), MCA, by failing to set out fully the resolution to be repealed.*

¶38 Montana Artesian contends Initiative 17-01 violates § 7-5-132(4)(b), MCA, because the petition did not include the entirety of Resolution 1594B, the resolution it purports to

rescind. Montana Artesian contends Initiative 17-01 lacks transparency and misleads the public because of this omission.

¶39     Section 7-5-132(4)(b), MCA, provides: "A petition or resolution for an election must . . . set out fully the ordinance sought, the ordinance to be amended and the proposed amendment, or the ordinance to be repealed." The statute does not require separate attachments to the petition of the ordinance sought to be enacted and the ordinance sought to be repealed. Rather, it requires the petition to "set out fully" the ordinance to be enacted and the ordinance to be repealed.

¶40     Here, Resolution 1594C was attached to the petition circulated for signature gathering. Resolution 1594C explains the history of the ESZD and the failed attempt to expand the district through petition to the Board in November 2016. It explains Resolution 1594C addresses the same expansion which the Board denied with Resolution 1594B and Resolution 1594C would rescind the denial. The District Court concluded the petition set out fully the petition to be repealed by the inclusion of Resolution 1594C, because the "petition summary of Resolution 1594B is clear, concise and accomplishes the goal of informing the voter of what Resolution No. 1594C would replace if adopted." We agree with the District Court.

¶41     *5. Whether the initiative violated § 7-5-132(4)(a), MCA, by legislating on multiple subjects.*

¶42     Montana Artesian contends Initiative 17-01 legislates on multiple subjects because it "summarily skips" procedural steps required under the Part 1 zoning process, such as

21

creating a new geographic zoning district, followed by the adoption of a development pattern, and finally the drafting and approval of zoning regulations.

¶43 Section 7-5-132(4)(a), MCA, provides: "A petition or resolution for an election must . . . embrace only a single comprehensive subject." The initiative added adjoining area to an existing zoning district. Its "single comprehensive subject" is the expansion of an existing zoning district to include certain contiguous real property. Montana Artesian's allegations of a failure to follow the procedures outlined under Part 1 for the creation of a zoning district is not a failure to "embrace only a single comprehensive subject" under § 7-5-132(4)(a), MCA. The District Court did not err in concluding Initiative 17-01 did not violate § 7-5-132(4)(a), MCA.

¶44 *6. Whether the initiative violated § 7-5-131(1), by legislating on subjects beyond the authority of the Flathead County Board of County Commissioners.*

¶45 Montana Artesian contends only a planning and zoning commission, appointed by the board of county commissioners under § 76-2-101(1), MCA, is empowered to draft and adopt the development pattern and recommend zoning regulations for a zoning district under Part 1 zoning. Montana Artesian maintains the initiative impermissibly bypassed the planning and zoning commission. Montana Artesian further contends the electorate, like the Board, has no power to enact zoning ordinances and resolutions absent consideration of "the public interest or convenience" under § 76-2-101(1), MCA. As Initiative 17-01 did not inform the voters zoning must be in the public interest or convenience, Montana Artesian contends the initiative legislates beyond the authority of the Board and is illegal.

22

¶46     Section 7-5-131(1), MCA, limits the powers of initiative and referendum to "[r]esolutions and ordinances within the legislative jurisdiction and power of the governing body of the local government." Section 76-2-101, MCA (2017),[6] provides "whenever the public interest or convenience may require and upon petition of 60% of the affected real property owners in the proposed district, the board of county commissioners may create a planning and zoning district and appoint a planning and zoning commission consisting of seven members." When two prerequisites are met—"public interest or convenience" and "petition of 60% of the affected real property owners in the proposed district"—this section empowers a board of county commissioners both to create a planning and zoning district and to appoint a planning and zoning commission. After a planning and zoning district has been created, the Board may add land "directly adjacent to an existing planning and zoning district but that is not part of the district" to the existing planning and zoning district "subject to the procedures provided in this part." Section 76-2-117, MCA.

¶47     We agree with Montana Artesian the statutes to consider in determining the authority of the county's electors to expand the ESZD through citizen initiative under these circumstances are the Part 1 zoning statutes. The original ESZD was created through a citizen-initiated petition under Part 1 zoning and the push for the expansion began as a Part 1 zoning petition. The Board's denial of that citizen-initiated petition motivated the proponents of the expansion to pursue Initiative 17-01 to expand the ESZD through the initiative power of the people. Montana Artesian's contention Initiative 17-01

---

[6] This statute was amended in 2021. *See* 2021 Mont. Laws ch. 533, § 1.

23

impermissibly bypasses the planning and zoning committee's authority, however, is not supported by the plain language of §§ 76-2-101(1) and -117, MCA. Section 76-2-101(1), MCA (2017), empowers the Board to create a zoning district when the "public interest or convenience may require and upon petition of 60% of the affected real property owners in the proposed district." Section 76-2-117, MCA, empowers the Board to expand an existing zoning district to include adjacent land. The requirements for the Board to create a district—that is, "public interest or convenience" and "petition of 60% of the affected real property owners in the proposed district"—are the same procedural requirements for expansion of the existing district. As expanding the ESZD was within the "legislative jurisdiction and power of the local governing body," it is also subject to the initiative power of the people. *See* § 7-5-131(1), MCA. Nothing in § 76-2-117, MCA, suggests existing zoning regulations are repealed when a zoning district is expanded, requiring a planning and zoning commission to develop a new development pattern and recommend new zoning regulations. As the existing zoning regulations are not repealed, land added to a zoning district under § 76-2-117, MCA, becomes subject to those existing zoning regulations upon being added to the district. Initiative 17-01 expanded the ESZD and subjected the expanded area to the existing ESZD regulations. It did not create new regulations or bypass the authority of a planning and zoning commission to recommend regulations based on the development pattern of the district.

¶48 Montana Artesian next contests whether the expansion was made in the public interest and convenience. It focuses on the failure of the petition and ballot language to explain the requirement zoning must be in the public interest and convenience and how the

24

expansion met those requirements. As the people of Montana have reserved the power of initiative to themselves, this Court will not presume the voters are uninformed or failed to consider whether the initiative was in the public interest and convenience. Initiative is the county "itself legislating through its voters—an exercise of the voters of their traditional right through direct legislation to override the views of their elected representatives as to what serves the public interest." *City of Eastlake v. Forest City Enters., Inc.*, 426 U.S. 668, 678, 96 S. Ct. 2358, 2364 (1976) (quoting *S. Alameda Spanish Speaking Org. v. Union City*, 424 F.2d 291, 294 (9th Cir. 1970)). The District Court did not err in concluding Initiative 17-01 did not violate § 7-5-131(1), MCA, by legislating beyond the authority of the Board.

¶49    *7. Whether the initiative creates illegal reverse spot zoning.*

¶50    Montana Artesian contends the District Court erred in concluding Initiative 17-01 did not create illegal reverse spot zoning. Reverse spot zoning involves "a land-use decision which arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones." *Helena Sand & Gravel, Inc. v. Lewis & Clark Cty. Planning & Zoning Comm'n*, 2012 MT 272, ¶ 28, 367 Mont. 130, 290 P.3d 691 (quoting *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 132, 98 S. Ct. 2646, 2663 (1978)). The parties agree the relevant analysis for considering Montana Artesian's claim of illegal reverse spot zoning is the three-part framework from *Little v. Bd. of Cty. Comm'rs of Flathead Cty.*, 193 Mont. 334, 346, 631 P.2d 1282, 1289 (1981), which the District Court

25

applied in this case.[7]  The *Little* framework requires the court to consider whether: (1) "the requested use is significantly different from the prevailing use in the area," (2) "the area in which the requested use is to apply is rather small," and (3) "the requested change is more in the nature of special legislation."  *Little*, 193 Mont. at 346, 631 P.2d at 1289; *see also Helena Sand & Gravel, Inc.*, ¶ 29.  Whether impermissible reverse spot zoning has occurred is a fact-specific inquiry, "but 'usually all three elements are present' when illegal spot zoning has occurred."  *Helena Sand & Gravel, Inc.*, ¶ 29 *(*quoting *Little*, 193 Mont. at 346, 631 P.2d at 1289).

¶51     Montana Artesian takes issue with the District Court's analysis of all three factors. Montana Artesian argues under the first prong of the *Little* test the District Court should have considered the zoning status of the lands surrounding the expanded ESZD.  Montana Artesian argues a water-bottling facility or other commercial uses could operate in the unzoned land surrounding the expanded ESZD and such uses comport with the Flathead County Growth Policy.  Further, Montana Artesian argues the existing prevailing uses in the expanded ESZD are significantly different than the proposed uses under the ESZD regulations because none of the parcels in the expanded ESZD meet the 80-acre minimum lot size under the ESZD regulations.

---

[7] Although *Little* involved spot zoning, not reverse spot zoning, we applied the test to reverse spot zoning in *Helena Sand & Gravel, Inc.*, under the theory "[b]oth spot zoning and reverse spot zoning involve the process of *singling out a small parcel of land* for differential use classification." *Helena Sand & Gravel, Inc.*, ¶ 28 (internal quotations omitted) (emphasis in original).  We noted in that case the outcome likely would have been same under the definition of reverse spot zoning used in *Penn Cent. Transp. Co.*, 438 U.S. at 132, 98 S. Ct. at 2663.  *Helena Sand & Gravel, Inc.*, ¶ 33.

¶52    In *Plains Grains L.P. v Bd. of Cty. Comm'rs of Cascade Cty.*, 2010 MT 155, ¶ 60, 357 Mont. 61, 238 P.3d 332, we explained when determining whether prevailing uses are significantly different from the proposed use under the new zoning, a court may consider both the existing prevailing uses and the uses allowed by current zoning, but consideration of what uses would be available under existing zoning is not in lieu of the consideration of existing prevailing uses. Although *Plains Grains L.P.* was a spot zoning case, the same logic applies to a claim of reverse spot zoning. Here, any proposed use is limited under the ESZD regulations to rural agricultural and residential. The District Court found the existing prevailing use of the land included in the expansion and the area surrounding the expansion was also rural agricultural and residential. While the parcels in the expanded ESZD may not meet the 80-acre minimum requirement required under the ESZD regulations, the prevailing use of the lots is still rural agricultural and residential, and the regulations now prevent the lots from being further subdivided. Based on the record before us, the expanded ESZD does not prohibit, require, or allow uses significantly different from the prevailing uses in the area. *See North 93 Neighbors, Inc. v. Bd. of Cty. Comm'rs of Flathead Cty.*, 2006 MT 132, ¶ 67, 332 Mont. 327, 137 P.3d 557. Although commercial uses may be permissible in the unzoned area surrounding the expanded ESZD, nothing in the record indicates the parcels in the surrounding area are currently put to a commercial use. As we have previously held, merely "[e]xtending a preexisting zone classification to include a larger area does not constitute spot zoning." *Plains Grains L.P.*, ¶ 61 (quoting *North 93 Neighbors, Inc.*, ¶ 67) (alteration in original). The same principle holds for reverse spot zoning.

27

¶53 Under the second prong, Montana Artesian contends the District Court erred because it focused solely on the size of the parcel of land involved and did not consider the number of landowners negatively affected by the zoning change.

¶54 In a reverse spot zoning case, the second prong is "concerned more with the number of separate landowners . . . than it is with the actual size of the area" and "size may not be the vital factor if the real issue is a question of [detrimental] treatment for one or a few persons as against the general public." *Little*, 193 Mont. at 346, 348, 631 P.2d at 1289, 1290.[8] Initiative 17-01 added approximately 530 contiguous acres to the existing 1,150-acre ESZD. This newly zoned area is "not physically small." *Helena Sand & Gravel, Inc.*, ¶ 30. Under Part 1 zoning a district can be "any area that consists of not less than 40 acres." Section 76-2-101(3), MCA. Montana Artesian contends it is the only landowner negatively impacted by the expansion. But at least 25 landowners are included in the expanded ESZD. All face the same new restrictions on their properties.

¶55 Finally, Montana Artesian contends Initiative 17-01 resembles special legislation because it does not comply with the Flathead County Growth Policy. Montana Artesian contends even absent consideration of the Growth Policy, the initiative resembles special legislation because the motivation of the initiative proponents in expanding the ESZD was to eliminate Montana Artesian's operations. Montana Artesian contends voters were

---

[8] As *Little* dealt with spot zoning it discussed the number of landowners benefited by the change and preferential treatment of one or a few persons as against the general public. The relevant analysis in this reverse spot zoning claim is the number of landowners negatively affected by the change and who receive detrimental treatment as against the general public.

28

flooded with anti-Montana Artesian propaganda leading up to the election and the initiative became not about zoning at all, but about eliminating Montana Artesian. Montana Artesian contends the hallmark of special legislation in the context of reverse spot zoning is whether the regulation was designed to adversely affect only one or a few landowners and Initiative 17-01 was specifically designed to end Montana Artesian's operations.

¶56     A change in zoning is in the nature of special legislation for a claim of reverse spot zoning when it is designed to adversely affect only one or a few landowners to the benefit of the surrounding landowners or the general public. *See Little*, 193 Mont. at 346, 631 P.2d at 1289. But this Court has explained, "zoning is not 'in the nature of special legislation' if it substantially complies with the growth policy." *Helena Sand & Gravel, Inc.*, ¶ 31; *see Little*, 193 Mont. at 347, 631 P.2d at 1290. This is because the zoning statutes place great weight on the comprehensive growth plan and zoning regulations adopted by a local governing body through a deliberative process. An area covered by a growth policy "must be guided by and give consideration to the general policy and pattern of development set out in the growth policy." Section 76-1-605(1), MCA; *Helena Sand & Gravel, Inc.*, ¶ 17.

¶57     The District Court concluded the expansion of the ESZD comported with the Growth Policy of the County. Montana Artesian argues the expanded ESZD does not comport with the Growth Policy of the County because it does not meet the constitutional tests of due process, equal protection, and avoiding a taking. As discussed below, the expanded ESZD does not violate these constitutional principles. The Flathead County Growth Policy describes seven elements of the public's vision for growth in the county and includes goals and policies to guide the County's decision making to implement those

29

seven elements. Among the goals of the Growth Policy is the goal to "preserve and protect the right to farm and harvest as well as the custom, culture, environmental benefits and character of agriculture . . . while allowing existing landowners flexibility of land uses." The stated purpose of the ESZD is "to protect and preserve agricultural land in the Egan Slough area for the performance of a wide range of agricultural functions. It is intended to control the scattered intrusion of uses not compatible with an agricultural environment, including, but not limited to, residential development." This goal complies with the Growth Policy. Nothing in the record indicates this goal is unsuitable for the area of the expanded ESZD.

¶58 We are also not persuaded any improper motivations of the Initiative 17-01 proponents must be imputed to the entire Flathead County electorate and invalidate an initiative that was passed with the support of over 70 percent of the voters. "That some voters individually may have failed to meet their responsibilities as legislators to vote wisely and unselfishly cannot alter the result" unless the initiative "on its face was so unrelated to acceptable public interest standards as to constitute an arbitrary or unreasonable exercise of the police power." *S. Alameda Spanish Speaking Org.*, 424 F.2d at 494. The people of Montana have reserved the right to the initiative and referendum for themselves in our Constitution. As we explained above, we will not presume the electorate is uninformed or making its decisions based on improper motives. As the initiative complies with the Growth Policy previously adopted by the Board, we cannot say the initiative "on its face was so unrelated to acceptable public interest standards as to

30

constitute an arbitrary or unreasonable exercise of the police power" that would constitute special legislation in this case. *See S. Alameda Spanish Speaking Org.*, 424 F.2d at 294.

¶59 *8. Whether the District Court abused its discretion in declining to compel discovery.*

¶60 Montana Artesian takes issue with the District Court's denial of its motion to compel external communications of proponents of Initiative 17-01, relating to their motivation for promoting the passage of Initiative 17-01. Montana Artesian contends evidence of improper motive on the part of proponents of the initiative is relevant to whether the initiative constituted illegal reverse spot zoning or violated due process and equal protection. Montana Artesian also faults the District Court's denial of its motion to compel because it prevented Montana Artesian from discovering evidence of fraud, which Montana Artesian contends the District Court acknowledged in its order would demonstrate an improper motive for promoting the passage of Initiative 17-01. Montana Artesian maintains the District Court recognized the relevance of the motivation of the initiative proponents by allowing Montana Artesian to question the proponents about their motivation during their depositions.

¶61 Even accepting Montana Artesian's contention the external communications of the initiative proponents were relevant, the District Court has wide discretion under M. R. Civ. P. 26 and 37 to control and to compel discovery. Rule 26 allows the District Court, on motion or on its own, to limit the extent of discovery if "the discovery sought is unreasonably cumulative or duplicative," among other reasons. As the District Court allowed Montana Artesian to question initiative proponents about their motivation in propounding the initiative at their depositions, additional discovery of external

31

communications regarding the same would be cumulative and duplicative. The District Court did not abuse its discretion in denying Montana Artesian's motion to compel and limiting discovery.

¶62    *9. Whether the initiative violated procedural due process.*

¶63    Montana Artesian makes two separate due process arguments on appeal. First, Montana Artesian argues the initiative violated due process because it misled voters. Montana Artesian argues the ballot language did not inform voters no lots in the proposed expansion met the 80-acre minimum and the Board had denied a previous citizen petition to expand the ESZD.

¶64    In the context of citizen initiatives, due process requires "voters [to] not be misled to the extent they do not know what they are voting for or against." *State ex rel. Mont. Citizens for Pres. of Citizen's Rights v. Waltermire*, 227 Mont. 85, 90, 738 P.2d 1255, 1258 (1987). "Due process is satisfied if the voters are informed by or with the ballot of the subject of the amendment, are given a fair opportunity by publication to consider its full text, and are not deceived by the ballot's words." *Waltermire*, 227 Mont. at 90, 738 P.2d at 1258.

¶65    The summary description of Initiative 17-01 on the June 5, 2018 ballot stated:

> Resolution No. 1594C proposes to add currently unzoned property to the Egan Slough Zoning District. The Egan Slough Zoning District was created in 2002 and is subject to the Egan Slough Zoning Regulations limiting allowable uses and requiring a minimum lot area of 80 acres (except for non-conforming parcels at the time of zoning enactment). If approved by a majority of Flathead County voters, the properties described in Resolution No. 1594C will be immediately added to the Egan Slough Zoning District.

32

The ballot language informed voters the ESZD limited allowable uses of property and restricted lot sizes. It also informed voters nonconforming parcels at the time of the zoning enactment would be excepted from the regulations. This ballot language fairly informed voters of the subject of the initiative and did not deceive voters. Due process does not require the ballot language to inform voters no parcels met the 80-acre minimum or the Board had previously denied the petition to expand the district. The ballot language was sufficient to satisfy minimum due process requirements.

¶66 Second, Montana Artesian argues the initiative process violated the due process requirements for zoning regulations to pass constitutional muster. Montana Artesian maintains zoning regulations restricting the use of private property violate due process unless the zoning serves public health, safety, or the general welfare, but the initiative provided no standards or guidelines for the voters to apply in exercising this police power, resulting in a due process violation. Montana Artesian relies on *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 49 S. Ct. 50 (1928), *Williams*, ¶¶ 51-53, and *Shannon v. City of Forsyth*, 205 Mont. 111, 666 P.2d 750 (1983).

¶67 Montana Artesian's reliance on these cases is misplaced. Each of those cases involved the unconstitutional delegation of legislative authority to a relatively small group of private parties without any standards or guidelines for exercising that delegated power. *See Williams*, ¶¶ 45-48. An initiative, however, is not a delegation of legislative responsibility: "It is the [county] itself legislating through its voters—an exercise by the voters of their traditional right through direct legislation to override the views of their elected representatives as to what serves the public interest." *S. Alameda Spanish Speaking*

33

*Org.*, 424 F.2d at 294. The initiative "process does not, in itself, violate the Due Process Clause of the Fourteenth Amendment when applied to a rezoning ordinance." *City of Eastlake*, 426 U.S. at 679, 96 S. Ct. at 2365. The standard for evaluating whether zoning passed through initiative violates due process is whether the zoning regulations "bear a substantial relation to the public health, safety, morals, or general welfare." *Roberge*, 278 U.S. at 121, 49 S. Ct. at 51-52 (quoting *Nectow v. City of Cambridge*, 277 U.S. 183, 188, 48 S. Ct. 447, 448 (1928)).

¶68 There are many environmental and social values involved in a determination of how land would best be used in the public interest. The District Court found the expanded ESZD was "zoned to preserve the rural nature of the property, limit commercial activity, protect natural resources such as water, clean air and noise, [and] impose restrictions on the subdivision of property." We cannot say Initiative 17-01 "on its face was so unrelated to acceptable public interest standards as to constitute an arbitrary or unreasonable exercise of the police power." *S. Alameda Spanish Speaking Org.*, 424 F.2d at 294. The initiative is not such an arbitrary or unreasonable exercise of the zoning power as to be violative of Montana Artesian's right to due process of law.

¶69 *10. Whether the initiative violated the right to equal protection.*

¶70 Montana Artesian argues the initiative violates equal protection because the initiative subjected it to restrictions on the commercial use of its property other commercial enterprises are not subjected to without any connection to advancing public health, safety, and general welfare. Montana Artesian argues the initiative made its rights dependent wholly on the will and whim of the voters without the application of any sensible fixed

guidelines or standards. For the same reasons Montana Artesian's due process claim fails, so does its equal protection claim.

¶71   *11. Whether the initiative constitutes a taking of Montana Artesian's water right and other business property.*

¶72   Montana Artesian contends the ESZD regulations constitute a regulatory taking of its water right and other business and commercial property. Montana Artesian argues the District Court's analysis of the first and third *Penn Central* factors was flawed because it was premised on the incorrect conclusion Montana Artesian does not have a water right. Montana Artesian maintains its water permit is a water right and a protected property right under Montana law that is compensable under the takings clause. Montana Artesian contends § 14.4 of the ESZD regulations, which limits the expansion of its building to 50 percent of the existing structure, amounts to a taking of its water right, as Montana Artesian will be unable to use its entire water right of 710.53 acre feet per year without a greater building expansion. Montana Artesian further argues the District Court failed to consider Montana Artesian's other compensable business and commercial property. Relying on *Knight v. Billings*, 197 Mont. 165, 642 P.2d 141 (1982), Montana Artesian argues it is entitled to be compensated for loss in the "use and marketability" of its business and commercial property.

¶73   The Takings Clause of the Fifth Amendment to the United States Constitution and Article II, Section 29, of the Montana Constitution protect private property rights from

being taken for public use without just compensation.[9]  Whether government action amounts to a taking of private property requires a two-step inquiry: "first, whether the plaintiff has a constitutionally protected private property interest and second, whether the property owner has been deprived of that interest." *Helena Sand & Gravel, Inc.*, ¶ 35. "Under Montana law, 'the threshold question of whether one has a protected property interest must . . . be answered in the affirmative before the question of whether one was deprived of that interest may be submitted to' the trier of fact." *Seven Up Pete Venture v. State*, 2005 MT 146, ¶ 26, 327 Mont. 306, 114 P.3d 1009 (quoting *Kiely Constr., L.L.C. v. City of Red Lodge*, 2002 MT 241, ¶ 25, 312 Mont. 52, 57 P.3d 836) (alteration in original). "Property interests themselves are not defined by the Takings Clause, or for that matter by Article II, Section 29; '[r]ather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Kafka*, ¶ 33 (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001, 104 S. Ct. 2862, 2872 (1984)).

¶74    Thus, we must first address the nature of Montana Artesian's property right in its water right.  Water rights, like other property rights, are protected against unreasonable state action. *See In re Adjudication of Water Rights within Yellowstone River*, 253 Mont.

---

[9] Although the language of Article II, Section 29, of the Montana Constitution includes somewhat broader language than the Fifth Amendment to the United States Constitution, this Court has "generally looked to federal case law for guidance when considering a takings claim brought under Article II, Section 29." *Kafka v. Mont. Dep't of Fish, Wildife & Parks*, 2008 MT 460, ¶ 30, 348 Mont. 80, 201 P.3d 8.  Montana Artesian has not presented argument to this Court Article II, Section 29 provides greater protection in the regulatory taking context than the Fifth Amendment.

167, 180-82, 832 P.2d 1210, 1218-19 (1992).  The nature of the property right in water use, however, is different than the right to other personal property.  We have explained:

> The so-called "ownership of water" differs from that of personal property capable of corporeal possession.  Neither the appropriator of water nor one to whom a right is decreed owns the corpus of any part of the flow of the stream.  He is entitled to only the beneficial use of the amount of water called for by his appropriation or decree when he has need therefor, and providing his distributing system has a sufficient capacity to carry such an amount of water.  When his ditches are incapable of carrying the amount of water decreed to him, his right is measured by the capacity of a system of distribution, regardless of his needs.  So long as a party has all the water his necessity requires or that his ditches will carry, it is immaterial that he has a right, under decree or otherwise, to a greater flow from the creek.

*McDonald v. State*, 220 Mont. 519, 526, 722 P.2d 598, 602 (1986) (quoting *Tucker v. Missoula Light & Water Co.*, 77 Mont. 91, 101-02, 250 P. 11, 15 (1926) (citations omitted)).

¶75    It is a fundamental premise of Montana water law that beneficial use is "the *basis*, the *measure*, and the *limit* of all rights to the use of water."  *McDonald*, 220 Mont. at 530, 722 P.2d at 605 (emphasis in original); *see also* Mont. Const. art. IX, § 3(3) ("All surface, underground, flood, and atmospheric waters within the boundaries of the state are the property of the state for the use of its people and are subject to appropriation *for beneficial uses* as provided by law." (emphasis added)); Section 85-2-311(1)(d), MCA.  "The extent of an appropriation of water is limited to beneficial use, and this *irrespective of greater quantity attempted to be appropriated*."  *Jacobs v. City of Harlowton*, 66 Mont. 312, 319, 213 P. 244, 245 (1923) (emphasis added); *see also Allen v. Petrick*, 69 Mont. 373, 376-77, 222 P. 451, 452 (1924) ("The quantity of water which may be claimed lawfully under a prior appropriation is limited to that quantity within the amount claimed which the

37

appropriator has needed, and which within a reasonable time he has actually and economically applied to beneficial use . . . the principle of beneficial use [being of] paramount importance."). These fundamental principles govern water rights permitted through the DNRC. The amount of water the DNRC can approve under a permit issued pursuant to Title 85, chapter 2, part 3, MCA, is limited to the amount of water necessary to sustain the beneficial use. *See* § 85-2-311(1)(d), MCA. This limitation reflects the prior appropriation principles of bona fide intent and anti-speculation. *See McDonald*, 220 Mont. at 532, 722 P.2d at 606; *Allen*, 69 Mont. at 379, 222 P. at 453; *Toohey v. Campbell*, 24 Mont. 13, 17, 60 P. 396, 397 (1900).

¶76 DNRC noted in its final decision Montana Artesian submitted a detailed development and operation plan for gradual development of the project over a 20-year period to use up to 710.53 acre feet of water annually and such projected use was reasonable. The DNRC further noted, however, if Montana Artesian "is unable to obtain additional discharge permits, or the project does not develop to full buildout within 20 years, the permit will only be perfected for that amount of water actually put to beneficial use, or [Montana Artesian] will be required to demonstrate it has proceeded with reasonable diligence in development of the project to obtain additional time to complete the project." The permit is explicit Montana Artesian's water right is grounded in what it can put to beneficial use. Subject to the needs of senior water rights, Montana Artesian is entitled under the permit to work toward putting 710.53 acre feet of water to the beneficial use described in its application to DNRC. Montana Artesian will not lose its water right if it does not put 710.53 acre feet to beneficial use within twenty years, but it may fail to

perfect the portion of its right to appropriate water it is not capable of putting to beneficial use. This is the not the loss of a water right, as Montana Artesian contends, because Montana Artesian is not entitled to water it has never put and is incapable of putting to beneficial use. In other words, Montana Artesian has no property right in water it does not have the ability to put to a beneficial use.

¶77 Having defined the property right at issue, we must "determine whether a part or a whole of that interest has been appropriated by the government for the benefit of the public." *Kafka*, ¶ 67 (quotation omitted). When state action or regulation diminishes the economic value of a compensable property interest, "just compensation may be required if 'justice and fairness require the economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.'" *Kafka*, ¶ 69 (quoting *Penn Cent. Transp. Co.*, 438 U.S. at 124, 98 S. Ct. at 2659). Such a determination is an "ad hoc, factual inquiry" based on the circumstances of each case. *Kafka*, ¶ 69. The United States Supreme Court in *Penn Central* suggested three factors for courts to consider in the course of making this determination: "(1) the character of the governmental action; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the economic impact of the regulation on the claimant." *Kafka*, ¶ 69.

¶78 Under the first prong, "courts should inquire concerning the magnitude or character of the burden imposed by the regulation, and determine whether it is functionally comparable to government appropriation or invasion of private property." *Kafka*, ¶ 71. Regulations that merely impair or significantly decrease the profitable use of property do

39

not amount to a taking. *Kafka*, ¶ 87. Under the second prong, "the claimant's expectation must be 'reasonable . . . [and] must be more than a unilateral expectation or an abstract need.'" *Kafka*, ¶ 72 (quoting *Ruckelshaus*, 467 U.S. at 1005-06, 104 S. Ct. at 2874) (alterations in original). Finally, under the third prong, "the court measures the impact of the regulatory change by considering the change in the fair market value of the subject property caused by the regulatory imposition—in other words, the court must compare the value that has been taken from the property with the value that remains in the property." *Kafka*, ¶ 72 (internal quotations omitted). "The *Penn Central* test ultimately calls for a weighing or balancing of these factors in order 'to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain.'" *Kafka*, ¶ 94 (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539, 125 S. Ct. 2074, 2082 (2005)).

¶79 Montana Artesian challenges the District Court's application of the first and third *Penn Central* factors, contending the District Court's analysis under these two factors was flawed because it was premised on the incorrect conclusion Montana Artesian's water permit was not a water right. As we explained above, Montana Artesian's water permit is a water right, but Montana Arteisan is not entitled through its water permit to water it is not capable of putting to beneficial use.

¶80 Under the first prong, the government action at issue here is the imposition of the ESZD regulations, which limits the expansion of the building that houses the water bottling facility. "Zoning regulations rarely amount to a taking of property on the ground that they affect some property owners more severely than others, 'because a landowner is not

entitled to the highest and best use of [its] property.'" *Helena Sand & Gravel, Inc.*, ¶ 43 (quoting *Animas Valley Sand & Gravel, Inc. v. Bd. of Co. Comm'rs of the Co. of La Plata*, 38 P.3d 59, 65 (Colo. 2001)). As the District Court recognized, the regulations do not directly limit the amount of water Montana Artesian may put to beneficial use under its water permit. Montana Artesian may continue to work toward developing its facility to bottle water and use its water right. Given the unique nature of the property right in water, Montana Artesian's contention it will not be able to use the full 710.53 acre feet of its water right under the restrictions of § 14.4 cannot establish a taking. Montana Artesian is not entitled to and thus is not entitled to be compensated for any water it is not capable of putting to a beneficial use.

¶81 The third prong considers the economic impact of the regulation on Montana Artesian. In considering this prong, the District Court concluded "there is no taking because [Montana Artesian] has no water right, only the opportunity to attain such a right through 'annual use." While it is an imprecise statement of the law to say Montana Artesian has no water right, it is true a water right in Montana is, by its very nature, limited to that which the holder can put to beneficial use "irrespective of greater quantity attempted to be appropriated." *Jacobs*, 66 Mont. at 319, 213 P. at 245. Montana Artesian is not entitled through its water permit to water it is not capable of putting to beneficial use. Ultimately, the District Court concluded the first and third prongs outweighed any investment-backed expectations Montana Artesian had under the second prong and we agree. The purported taking here is not the functional equivalent of a direct appropriation of property, nor does it constitute an ouster. Montana Artesian has not lost its water right

41

or its property interest in that water right as a consequence of the regulations. The building limitations of § 14.4 do not constitute a compensable taking of Montana Artesian's property.

¶82 Finally, Montana Artesian argues the decreased values of its business and commercial property are compensable under this Court's holding in *Knight*. Montana Artesian's reliance on *Knight* is misplaced. *Knight* is an inverse condemnation case, not a regulatory takings case. Inverse condemnation occurs when a public improvement, deliberately planned and built, proximately causes damage to the plaintiff's property. *Deschner v. State*, 2017 MT 37, ¶ 22, 386 Mont. 342, 390 P.3d 152. This is simply not a case of inverse condemnation. In *Knight*, the land was zoned as residential and the city denied the landowners' motion to change the zoning to allow for more uses after a street widening project dramatically changed the character of the neighborhood. *Knight*, 197 Mont. at 168, 642 P.2d at 142-43. The property owners then sought compensation under the takings clause for the reduced values of their properties. The Court concluded the changes in the neighborhood had made the "properties nearly unusable and unmarketable for residential purposes," noting the city had condemned the houses on the other side of the street and compensated those property owners when it expanded the street. *Knight*, 197 Mont. at 173-74, 642 P.2d at 145-46. It was the city's street expansion, coupled with the city's refusal to expand allowable uses through a zoning change, that resulted in compensable inverse condemnation of the property in *Knight*. Here, no public improvement, deliberately planned and built, proximately causes damage to the plaintiff's property.

¶83  *12. Whether the District Court abused its discretion in denying Montana Artesian attorney fees and costs related to defending Egan Slough Community's petition for writ of mandate.*

¶84  Montana Artesian argues it is entitled to attorney fees under the equitable exception in *Foy* for fees incurred defending against Egan Slough Community's claim for mandamus relief. Montana Artesian maintains the District Court incorrectly determined the mandamus claim was not against Montana Artesian and the court did not rule on the claim. Montana Artesian maintains there was no reasonable basis for Egan Slough Community to believe the mandamus claim might prevail because enforcement is not a ministerial act and Egan Slough Community had a plain, speedy, and adequate remedy in its declaratory judgment claim.

¶85  A court, under its equity powers, may award attorney fees to make an injured party whole in the limited circumstance "where a party has been forced to defend against a wholly frivolous or malicious action." *Braach v. Graybeal*, 1999 MT 234, ¶ 9, 296 Mont. 138, 988 P.2d 761. A court must determine such awards "on a case-by-case basis." *Braach*, ¶ 9.

¶86  Egan Slough Community filed its original complaint on September 7, 2018, seeking mandamus and declaratory relief. The mandamus claim was based on the County's alleged inaction in enforcing the ESZD regulations. On September 13, 2018, Egan Slough Community filed an application for writ of mandamus and sought a show cause hearing. The District Court held a show cause hearing on September 25, 2018. At this point, Egan Slough Community had not received a response to two letters it had sent to the County in June and August, complaining about Montana Artesian's alleged zoning violations.

43

Planning and Zoning Director Mark Mussman testified at the hearing the County's investigation into the alleged zoning violations was ongoing and he did not know how long the investigation would take to complete. The parties submitted post-hearing supplemental briefing on October 19, 2018, on the question whether mandamus was the proper remedy, as well as whether Montana Artesian was in violation of the ESZD regulations. On December 10, 2018, when a decision from the County was still not forthcoming, the District Court ordered the County to provide an update on the status of its investigation to the court by December 31, 2018. On December 28, 2018, the County informed the court the investigation was complete and a report would be forthcoming by January 4, 2019. The County filed a notice of its Enforcement Decision with the court on January 4, 2019.

¶87 In its motion for summary judgment filed on September 20, 2019, Egan Slough Community moved for summary judgment on three of the four counts of its complaint, including the writ of mandate. It did not, however, address the mandamus issue in its accompanying brief. Montana Artesian also did not address the issue in its brief in opposition. In its reply brief, Egan Slough Community moved to withdraw its motion for summary judgment on the mandamus claim and dismiss that count. In its second order on summary judgment issued on November 25, 2019, the District Court denied summary judgment on the issue of mandamus, as the Egan Slough Community had a plain, speedy, and adequate remedy in the ordinary course of law.

¶88 Montana Artesian later sought attorney fees related to defending against the mandamus claim, arguing Egan Slough Community pursued the claim knowing it did not meet the requisite showing for mandamus. Montana Artesian sought attorney fees and

44

costs related to its response brief filed before the September 25, 2018 show cause hearing, the show cause hearing, and its post-hearing supplemental brief, totaling over ten thousand dollars. The District Court denied the motion, explaining that during the period from June 21, 2018, to January 3, 2019, there was a broad question whether the County would enforce or acknowledge the ESZD regulations in the expanded ESZD. The court explained during this time, it viewed the parties' arguments on the question whether Montana Artesian was in violation of the ESZD regulations as secondary to the question of whether the County would enforce or acknowledge the ESZD regulations. The court recognized it was unknown whether the application for mandamus prompted the County to issue its Enforcement Decision. The court concluded Egan Slough Community did not lose its mandamus claim, however, as the County acted after the claim was filed and the court did not rule on the claim. Under these facts, the court determined an award of attorney fees under the equitable *Foy* exception was not appropriate.

¶89 Montana Artesian takes issue with the court's conclusion it did not rule on the issue, as the court specifically denied summary judgment and effectively dismissed the claim in its November 25, 2019 summary judgment order. Montana Artesian is correct the District Court did briefly address and deny the claim in the November 25, 2019 order. The court indicated in its order denying Montana Artesian's motion for attorney fees, however, the claim was not frivolous and it was considering granting mandamus until the County acted on January 4, 2019. The costs Montana Artesian identified in its briefing were all incurred before January 4, 2019. Under these facts, the District Court did not abuse its discretion in denying Montana Artesian's motion for attorney fees under the equitable *Foy* exception.

45

## CONCLUSION

¶90    In summary, we affirm the District Court's June 6, 2019 order denying Montana Artesian's motion for summary judgment on the validity of the ballot initiative process. We affirm the District Court's November 25, 2019 order affirming the Enforcement Decision conclusion Montana Artesian's facility is a legal nonconforming use under the ESZD regulations and denying Egan Slough Community's motion for summary judgment. We affirm the District Court's December 15, 2020 order concluding Initiative 17-01 and the ESZD regulations were not unconstitutional and Initiative 17-01 was not illegal reverse spot zoning and granting summary judgment to Egan Slough Community.  We affirm the District Court's denial of Montana Artesian's motion to compel discovery and the denial of its motion for attorney fees.

¶91    The District Court is affirmed.

/S/ INGRID GUSTAFSON

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE